UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

# 13 CV 4699

------------------------------------x
HENRY VARGAS,

         Plaintiff,

  -against-

CARL E. PERSON,

        Defendant.
------------------------------------x

**COMPLAINT**

**Jury Trial Demanded**



Plaintiff, Henry Vargas, as and for his complaint against
Defendant, Carl E. Person, respectfully alleges as follows:

## PARTIES

1. Plaintiff, Henry Vargas (hereinafter "Vargas"), is a
resident of the City of Kissimmee and State of Florida, currently
incarcerated at the Watertown Correctional Facility, located at
23147 Swan Road, Watertown, New York 13601.

2. Defendant, Carl E. Person (hereinafter "Person"), is a
resident of the City and State of New York.

3. At all relevant times to this action, Vargas was President,
and sole shareholder to four New York State Corporations, E.R.
Properties, Inc.; Vargas Realty Enterprises, Inc.; V&R Realty Corp.;
and Noble Realty Corp. (hereinafter "Four Corps."), in which the
Four Corps. owned real properties located at 136 West 111th Street,
140 West 111th Street, 144 West 111th Street and 148 West 111th
Street (hereinafter "the properties"), in the City and State of N.Y.

4. At all relevant times to this action, Person was and still
is an attorney duly licensed for the practice of law in the State
of New York, maintaining a place of business located at 325 West
45th Street New York, New York 10036.

5. On or about November 25, 2008, Vargas with his Four Corps. retained person for the sole purpose to only to represent Vargas and his Four Corps., to negotiate and execute a Pre-Negotiation Agreement (hereinafter "Agreement"), as borrowers, of an $8 million mortgage, with Vargas' lender, known as CFA West 111 Street, L.L.C. (hereinafter "CFA"). See Exhibit "A"

## JURISDICTION

6. This Court has subject matter jurisdiction pursuant to 28 U.S.C. section 1332(a)(1).

## VENUE

7. Venue in this district is proper pursuant to 28 U.S.C. section 1391(a)(b) because the causes of actions arose out of New York City.

## FACTS

8. Vargas has suffered actual losses of $7,300,000 as a foreseeable, normal and natural result of an intentional fraud, reckless fraudulent conduct and Attorney's legal malpractice by Person, the Defendant herein.

9. On August 28, 2007, Vargas, personally, as President, owner and sole shareholder of his Four Corps, executed a promissary note and mortgage for the principal amount of $8 million. The note and mortgage was made out to CFA West 111 Street, L.L.C., as lender and was secured by Vargas personally, athe Four Corps. and the Properties.

10. On or about December 1, 2008, Vargas was approved for a $9,000,000 mortgage refinance commitment issued by Dime Savings Bank and Mr. Michael Kessellmen of Meridian Capital Group, LLC, located at One Battery Park Plaza, New York, New York (hereinafter

"the Dime deal"), in which the Dime deal was suppose to satisfy Vargas' prior debt to CFA.

11. On or about December 1, 2008, at the suggestion, advise and representation of Person, Person persuaded and induced Vargas, his father Victor Vargas (hereinafter "Father"), to allow Person to negotiate, prepare and represent them in the Agreement between themselves and CFA in order to avoid foreclosure and in effort to reach a settlement or restructuring of the CFA note and mortgage unitl Vargas closes on the Dime deal.

12. On December 5, 2008, Vargas, his Father and CFA signed Agreement with Person present, as counsel at CFA's office located at 570 Lexington Avenue, 40th Floor, New York, New York 10022, care of Joel Fogel.

13. The Agreement confirmed Vargas', his Father's and the Four Corps' legal and enforceable obligations under the loan as well as their waiver of "any defenses, counterclaims or offsets", including any that could potentially be raised in the foreclosure action. In addition, Vargas provided CFA with a copy of the Dime deal the same day the Agreement was executed, December 5, 2008.

14. Vargas trusted and relied on the advise, representation of Person to negotiate such a strict agreement with CFA, only because Vargas had secured the refinance with the Dime deal, which would of satisfied the CFA debt.

15. The Agreement also acknowledged that "no provision of this letter agreement shall be construed against or interpreted to the disadvantage of any party by any court or other governmental or judicial authority by reason of such party having or being deemed

to have structured, dictated or drafted such provision."

16. Vargas was induced by Person and justifiably and reasonably relied on Person's advise and representation in executing and signing the Agreement, only because Vargas already had the Dime deal secured, in which Person was also going to prepare for a closing on the Dime deal.

17. Person as an attorney practicing law in New York State for over 40 years, had an ethical and moral duty to represent Vargas in consummating the Agreement with CFA and the Dime deal.

18. However, on or about December 15, 2008, Person, with the intent to defraud, wrote a letter to Dime Savings Bank and Meridian Capital Group, LLC, falsely claiming and knowing to be false, that Vargas had no authority or ownership of the Four Corps or the properties and therefore the Dime deal was canceled.

19. On or about December 1, 2008, Person perpetuated a scheme to defraud Vargas, personally, and his Properties, with the intent of committing fraud and legal malpractice by canceling the Dime deal without authorization from Vargas and such fraudulent and malpractice hindered Vargas' obligations to the Agreement which jeopardized Vargas' Properties.

20. Due to Person's fraudulent acts and malpractice, Vargas was unable to reach a resolution with CFA, Vargas' name was tainted and his reputation with Meridian Capital Group because of Person's false claims and therefore the CFA debt was already in foreclosure.

21. On January 29, 2009, Person further continued to perpetuate his scheme to defraud and malpractice, without authorization from Vargas, Person filed a Chapter 11 petition in the United States Bankruptcy Court for the Southern District of New York and commenced

a false adversary proceedings before Honorable Stuart M. Bernstein, Bankruptcy Judge.

22. In the false adversary complaint, Person falsely requested knowing to be false, that the CFA note and mortgage be declared invalid and unenforceable because Vargas lacked authority to execute the CFA deal.

23. At all relevant times to this action, Person fraudulently induced Vargas' Father to sign the adversary complaints against Vargas, stating that Vargas was never an officer, director, shareholder, manager, agent or employee of the Four Corps and was not authorized to take out any mortgages, which such complaints Person knew to be false because Person represented both Vargas and his Father in the Agreement, when it was signed and executed.

24. Person intentionally and fraudulently took advantage of Vargas' Father tricking his Father into signing the adversary complaints, knowing that Vargas' Father does not understand legal documents in english, see Exhibit "B", in which Person defrauded Vargas out of actual out of pocket loss of $300,000 in legal fees, and actual damages of $7,000,000.

25. According to the Agreement, Vargas was at all relevant times to this action, the President, personal Guarantor and sole shareholder of the Four Corps. and the Properties. See Exhibit "A", pages 5 and 6.

26. Person represented Vargas on the execution of the Agreement and therefore Person was well aware that both Vargas and his Father signed a waiver of "any defenses, counterclaims or offsets", See Exhibit "A" page 2, paragraph 7.

27. On or about July 23, 2009, following an oral argument, the Bankruptcy Court dismissed the adversary action by Judge Bernstein and on November 1, 2010, Honorable Richard J. Sullivan, United States District Judge affirmed the Bankruptcy Court's order and concluded that the "Pre-Negotiation Agreement (Agreement) acknowledged their "legal and enforceable obligations" to CFA under the CFA note and mortgage "without any defenses, counter-claims or offsets." See In Re Vargas Realty Enterprises, Inc., 440 B.R. 224, Exhibit "C".

28. Person set up and engineered a scheme to defraud Vargas, his Father and the Four Corps. by inducing Vargas to sign the Agreement and then by inducing Vargas' Father to sign a false adversary complaint for Bankruptcy Court, in which Person with the intent to defraud and commit legal malpractice defamed Vargas from obtaining any new mortgages to save his Properties and caused Vargas to suffer damages in the sum of $7,300,000.

29. Person knew that under New York Law, he was not authorized to prepare and file any Bankruptcy actions on behalf of the Four Corps., which were owned by Vargas.

30. Person knew that he was not authorized by Vargas of the Four Corps. to file any Bankruptcy proceedings on the behalf of the Properties.

31. Vargas was damaged by Person because Vargas justifiably and reasonably relied to his detriment on the knowingly intentionally material false representations of Person.

32. The knowing, intentional  and material false and negligent representations of Person, was made with the intent to defraud and in fact did defraud Vargas, his Four Corps. and his Properties

causing Vargas at least $7,300, 000 in damages.

33. Person's intentional and negligent representations damaged Vargas' name and reputation in which hindered Vargas from obtaining any new mortgage refinance deals to save his properties and further, such damages caused Vargas to loose his Properties to CFA through foreclosure.

34. At all relevant times to this action, Vargas' Properties had an appraised market value of approximately $15,000,000 and therefore, Vargas lossed $7,000,000 in equity of his Properties and $300,000 in legal fees paid to Person.

### FIRST CAUSE OF ACTION
### (Fraud)

35. Vargas re-alleges and reiterates all of the allegations contained in paragraphs 1 through 34 as if more fully set forth herein.

36. Person, individually and as an attorney was not authorized by Vargas, who was President and sole owner of the four Corps., to file any Bankruptcy petitions or to cancel the Dime deal.

37. Person prepared all documentations in connection to this action.

38. Person's unethical, fraudulent and negligent conduct deprived Vargas of his obligations in the Agreement, the Dime deal and publically and, such conduct was the sole cause of CFA to subsequently foreclose on Vargas' Properties, on or about November 1, 2010.

39. Person knew and intended that his representation individually and as an attorney to prepare and file a Bankruptcy action, was false when it was made.

40. Person knew and intended that his representations individually and as an attorney on the execution of the Agreement and the Dime deal would be relied upon by Vargas.

41. Vargas relied on the fraudulent representations that Person, individually and as an attorney would act in good faith pursuant to the Agreement and the Dime deal.

42. Person knew that his representations individually and as an attorney in preparing and filing a Bankruptcy action and canceling the Dime deal, would cause damage to Vargas personally, Four Corps., his Properties and his family.

43. Person is liable for misrepresentation and intentional fraud.

44. As a result of the foregoing, Vargas is entitled to a judgment against Person, who acted fraudulently, in the amount of $7,300,000, plus interest and legal fees.

45. Under New York Law, the statute of limitations for fraud is six years, running from the accrual of the action.

### SECOND CAUSE OF ACTION
(Attorney's Legal Malpractice)

46. Vargas re-alleges and reiterates all of the allegations contained in paragraphs 1-45, as if more fully set forth herein.

47. Person failed to abide and render services as reasonably expected of counsel pursuant to the Agreement and the Dime deal and was negligent in filing Bankruptcy petitions against Vargas, which caused Vargas irreparable damages upon Vargas personally.

48. Person failed to exercise the ordinary reasonable skill and knowledge commonly possessed by a member of the legal profession, and that the breach of Person's duty proximately caused Vargas to

sustain actual and ascertainable damages in the sum of $7,300,000, by failing to act as a reasonable attorney pursuant to the Agreement and the Dime deal, and was negligent, in that Vargas, Four Corps., Vargas' Father and CFA drafted and executed the Agreement in order to effectuate, "not deter", settlement in satisfying the CFA debt.

49. If Person had not deter from his duty as an attorney to Vargas, his Four Corps., and his Properties, and had actually effectuated his duty to Vargas pursuant to the Agreement and the Dime deal, Vargas would have not loss his properties through foreclosure and would have prevailed in the Dime deal and, in which, therefore Vargas would have not incurred any damages due to Person's negligence.

50. Vargas has been damaged by the failure of Person to properly represent his interest and because of Person's reckless misrepresentations, for the losses of Vargas in reliance to Person's representations.

51. Person is liable for Attorney's legal malpractice.

52. By reason of the foregoing, Vargas is entitled to a judgment against Person in the sum of $7,300,000, plus interest and legal fees.

53. Under New York Law, the statute of limitations for legal or Attorney's Malpractice is three years from the day the actionable injury occurred, (CPLR section 214(6)). Vargas' injury occurred on or about November 10, 2010.

### THIRD CAUSE OF ACTION
### (Punitive Damages)

54. Vargas re-alleges and reiterates all of the allegations contained in paragraphs 1 through 53, as if more fully set forth herein.

55. The fraudulent conduct and attorney's legal malpractice by Person was willful.

56. Person intentionally and knowingly caused Vargas pernament damages as mentioned in this action and also because on October 14, 2009, Person lied to the Press (The New York Times), that Vargas defrauded his Father, which Person knew to be false prior to making such claim and, such damage caused Vargas mental, emotional and irreparable harm.

57. Person's intentional fraud and attorney's legal malpractice against Vargas demonstrates a high degree of moral culpability.

58. In any case where a fraud or attorney's legal malpractice occurs, it demonstrates a high degree of moral culpability and punitive damages may be awarded even if such behavior is not aimed at the general public.

59. By filing false Bankruptcy claims and lying to the press, Person acted egregiously, and with willful and wanton disregard of his obligations to the general public, behavior which should and must be punished.

60. The Court has the power and authority to assess punitive damages against Defendant in order to deter any similar conduct now or in the future as well as punish him for his past misdeeds.

61. By reason of Person's egregious and outrageous behavior, and the high degree of moral culpability on a persistent and

repeated basis, demonstrated by Person, Vargas is entitled to judgment against Carl E. Person, the Defendant, for punitive damages in the amount of $73,000,000, plus interest and legal fees, as allowed by applicable law.

WHEREFORE, Plaintiff demands judgment:

A. On the first cause of action, against Defendant, Carl E. Person for actual damages for fraud, in the sum of $7,300,000;

B. On the second cause of action, against Defendant, Carl E. Person, for attorney's legal malpractice, in the sum of $7,300,000;

C. On the third cause of action, against Defendant, Carl E. Person, for punitive damages, in the sum $73,000,000; and

D. For such other, further relief as the Court deems just and proper.

Dated: Watertown, New York
       June 27, 2013

By: Henry Vargas, Pro se
    Plaintiff

December 5, 2008

E.R. Properties, Inc, Vargas Realty Enterprises,    Henry Vargas
Inc. V&R Realty Corp. & Noble Realty Corp.        140 West 111th Street, Suite B1
140 West 111th Street, Suite B1                          New York, NY 10026
New York, NY 10026

Re:    Loan (the "Loan") in the principal sum of $8,000,000 from CFA W111
         Street, L.L.C (the "Lender") dated as of August 28, 2007 to E.R. Properties,
         Inc, Vargas Realty Enterprises, Inc. V&R Realty Corp. & Noble Realty
         Corp. (collectively the "Borrower"), guaranteed by Henry Vargas (the
         "Guarantor")

Dear Sir or Madam:

As you know, Lender is the owner and holder of the above-referenced commercial Loan
to Borrower, and all the documents evidencing, security, guaranteeing or otherwise executed in
connection with the Loan (collectively, the "Loan Documents").

By a foreclosure action (the "Foreclosure Action") commenced by Lender on July 28,
2008 in the Supreme Court of the State of New York, New York County, under Index No.
10017/08, Lender seeks the foreclosure of the Property as evidenced by the Loan Documents
(the "Collateral") due to Events of Defaults under the Loan Documents by the Borrower.

Borrower has requested that Lender participate in negotiations regarding a potential
resolution of the above Events of Default and a settlement or restructure of the obligations under
the Loan (the "Obligations"). As a condition to participating in the negotiations, Borrower has
requested, Borrower and Lender have each required written confirmation and agreement to, the
following:

1.        Borrower and Lender confirm that they have not heretofore waived or
modified, and have not agreed to waive or modify, any term of the Loan Documents, and any
actions the Borrower takes or fails to take (including the expenditure of any funds) is at its own
risk.

2.        Borrower and Lender confirm that the Loan Documents cannot be
modified in any respect except by a definitive written agreement that has been executed and
delivered by authorized representatives of Borrower and Lender.

TAMPDOCS\529190.2

EXHIBIT "A"                                                          **JA-75**

(AGREEMENT)

December 5, 2008
Page 2

3.      All negotiations and discussions concerning the Loan and concerning a disposition of the Collateral shall constitute settlement discussions and confidential business discussions and may not be used or admitted into evidence in any court proceeding; provided, however, that this letter agreement and the acknowledgments by Borrower contained herein may be admitted into evidence in any such proceeding.

4.      No statement, comment, or representation made in any form whatsoever during the course of the negotiations may be relied upon by any party unless and until it is expressly incorporated into a final definitive written agreement executed by an authorized representative of the party to be charged. No statement, comment, or representation made in any form whatsoever shall constitute a waiver or modification of any of the provisions of the Loan Documents, or the rights and remedies contained therein, unless and until it is contained in a final definitive written agreement executed and delivered by an authorized representative of the party to be charged.

5.      Lender has $not$ waived and, by entering into this letter agreement and continuing negotiations with Borrower, is not waiving any rights or remedies including the right to demand immediate payment of all sums due under the Loan Documents. By entering into this letter agreement and negotiations with Borrower, Lender is not agreeing to forbear from exercising any rights or remedies, including the right to demand immediate payment of all sums due under the Loan Documents.

6.      Borrower acknowledges and agrees that, pursuant to the Loan Documents, it is liable for Lender's legal fees incurred in connection with the negotiations and assistance requested by Borrower, and in connection with enforcement of Lender's rights under the Loan Documents. In that regard, Borrower acknowledges that Lender has retained the firm of Kriss & Feuerstein LLP to represent it in this matter and, as such, Lender has already incurred legal fees for which Borrower will be liable.

7.      Borrower hereby acknowledges and agrees that the Loan Documents contain and constitute all of the agreements among Lender and Borrower. Borrower hereby acknowledges and agrees that the Loan Documents continue to constitute legal and enforceable obligations of Borrower, without any defenses, counterclaims or offsets, including any such defenses, counterclaims, or offsets raised by Borrower or Guarantor in the Foreclosure Action.

8.      Borrower agrees that it will keep Lender fully informed of all of Borrower's negotiations for the disposition of the Collateral or refinance of the Loan and of all information Borrower receives on that subject.

9.      Borrower hereby grants Lender the right to conduct such environmental investigations and/or testing as Lender deems necessary in order to determine whether or not there exists on any real property included in the Collateral any hazardous materials or other state of facts that would give rise to a violation of any environmental laws or regulations. In

**JA-76**

December 5, 2008
Page 3

furtherance thereof, Borrower gives Lender and/or its agents the right to go on to such real property to perform any such investigation and testing.

10.    By signing this letter agreement, Borrower acknowledges and agrees that Lender has no legal obligation to restructure the Obligations and it has not made any representations or warranties as to the outcome, if any, of its efforts. Lender shall have no liability if (for any reason or no reason) Lender and Borrower fail to consummate a restructure or settlement of the Obligations.

11.    Both Borrower and Lender acknowledge that it has participated in the negotiation of this letter agreement, and no provision of this letter agreement shall be construed against or interpreted to the disadvantage of any party by any court or other governmental or judicial authority by reason of such party having or being deemed to have structured, dictated or drafted such provision. Both Borrower and Lender have reviewed this letter agreement with counsel, understand the agreements contained herein, and have agreed to execute and deliver this letter agreement as its own free act and deed and without duress.

12.    The representations and agreements set forth herein may not be changed or modified except in a writing signed by the party to be charged. Borrower and Lender, or either of them, may, however, in its sole discretion, terminate these negotiations by written notice to the other party at any time and for any reason, without any liability to the other party for such termination.

13.    All notices and other communications shall be in writing and shall be deemed to have been duly given if delivered by hand, or given by electronic mail, or by facsimile transmission (with answer back received), or by courier service, or mailed by first class, registered or certified mail, return receipt requested, postage prepaid and addressed as follows:

If to Lender:

CFA W111 Street, L.L.C.
570 Lexington Avenue, 40th Floor
New York, NY 10022
Fax: (212) 319-1033
Attn Joel Fogel

JA-77

December 5, 2008
Page 4

With a copy to:

Jerold C. Feuerstein, Esq
Kriss & Feuerstein LLP
360 Lexington Avenue, Suite 1200
New York, New York 10017
Fax: (212) 661-9397

If to Borrower:

E.R. Properties, Inc, Vargas Realty Enterprises, Inc. V&R Realty
Corp. & Noble Realty Corp.
200 West 111th Street
New York, New York 10026
Fax:

With a copy to:

Carl E. Person, Esq.
325 W. 45th Street-Suite 201
New York , NY 10036
Fax:

Unless otherwise specified, all notices and other communications shall be deemed to have been duly given on the first to occur of actual receipt of the same or: (i) the date of delivery if personally delivered; (ii) the day the recipient's answer back is received if transmitted by electronic mail or facsimile; (iii) one (1) business day after depositing the same with the delivery service if by overnight delivery service; and (iv) three (3) business days following posting if transmitted by mail.

   14.   This letter agreement shall inure to the benefit of and be binding upon the heirs, successors and assigns of the parties.

   15.   This letter agreement may be executed in two or more counterparts each of which shall constitute an original and all of which shall, when taken together, constitute one and the same agreement, notwithstanding that all parties may not have signed all counterparts of this letter agreement.

   16.   This agreement shall be construed and enforced in accordance with the terms of the laws of the State of New York without regard to its conflicts of laws principles. If any provision of this agreement is not enforceable, the remaining provisions of the agreement shall be enforced in accordance with their terms. Borrower and Lender represent and warrant to each other that each is duly authorized to execute and deliver this agreement on their respective behalves.

TAMPDOCS\529190.2                        4

**JA-78**

December 5, 2008
Page 5

19.   Guarantor consents to this pre-negotiation agreement.

Very truly yours.

LENDER

CFA W11! STREET, L.L.C.

By: _____
    Eric Edidin,
    Managing Director

AGREED TO AND ACCEPTED:

BORROWER

E.R. PROPERTIES, INC

By: _____
    Henry Vargas
    President

VARGAS REALTY ENTERPRISES, INC

By: _____
    Henry Vargas
    President

V&R REALTY CORP

By: _____
    Henry Vargas
    President

TAMPDOCS\S291190.2                    5

**JA-80**

December 5, 2008
Page 6

NOBLE REALTY CORP.

By: _____
Henry Vargas
President

AS CONSENTED TO BY:

X _____
VICTOR VARGAS

GUARANTOR

_____
HENRY VARGAS

**JA-81**

WB_CFA3_MotDism3_Decl_VV_Edit.doc

**UNITED STATES BANKRUPTCY COURT**          Return Date: July 23, 2009 at 10:00 am
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------x   **Chapter 11**
In re:                                                      :   **Case No. 09-10402 (SMB)**
                                                            :   **Jointly Administered**
VARGAS REALTY ENTERPRISES, INC., et al.,                    :
                                                            :   **Adversary Proceeding Nos.**
                                    Debtors.                :   **09-01251 (VREI)**
-------------------------------------------------------------x   **09-01252 (Noble)**
                                                            :   **09-01253 (V&RRC)**
VARGAS REALTY ENTERPRISES, INC.,                            :   **09-01254 (ERPI)**
                                                            :
                              Adversary Plaintiff,          :
                                                            :
         -against-                                          :
                                                            :
CFA W. 111 STREET, L.L.C.,                                  :
                                                            :
                              Adversary Defendant.          :
-------------------------------------------------------------x

### DECLARATION OF VICTOR VARGAS IN OPPOSITION TO THE MOTION BY CFA W. 111 STREET, L.L.C. TO DISMISS THE AMENDED ADVERSARY COMPLAINT AGAINST CFA

I, Victor Vargas, declare under the penalty of perjury as follows:

1.      I am the sole shareholder and President of the above-captioned Adversary

Plaintiff, one of Vargas Realty Enterprises, Inc., Noble Realty Corp., V & R Realty Corp. and

E.R Properties, Inc., Debtors and Debtors in Possession (the "Debtors"), am fully familiar with

the facts stated herein, and make this declaration in opposition to the motion by creditor CFA W.

111 Street, L.L.C. ("CFA")to dismiss the Debtor's amended adversary complaint against CFA

under BR 7012 and FRCP 12(b) (the "CFA Motion").

2.      Prior to CFA's commencement of its foreclosure action against the Debtors,

neither I nor the Debtors had seen the CFA Note or Mortgage, and prior to preparing for the

filing of the Debtors' four related bankruptcy petitions, neither I nor the Debtors had been aware

.

EXHIBIT "B"

Page 10, Par. 38

35.   My native language is Spanish and I speak and understand Spanish fluently. I have some trouble in reading English newspapers because my vocabulary in English doesn't include many technical or long words.

36.   In my native country I worked in the military from 1963 to 1967, at which time I came alone (single) to the United States, and settled in Harlem, New York.

37.   First I worked as a cab driver, jewelry repairman and factory worker, after which I was able to get a job as a superintendent of one building, 140 W. 111th Street, and kept that job for about 5 years (1974-1979), at which time I was offered to buy the building.

38.   From the time I came to the United States until now, I have learned to speak and understand spoken English to some extent, but not as to any complicated matters. I rely upon my daughters (and formerly my son Henry) and my employees (mainly Isolina) to translate for me when I sense that I am not understanding what is being said. As to documents such as contracts, I usually need help to understand their meaning, but I sense that I miss many of the parts of a business document when it is explained to me in only a minute or so. I have had 40 years of dealing with a form lease for the rental of apartments and I pretty much understand the provisions in the lease, I believe.

39.   I read daily newspapers to try to improve my English, but have trouble reading articles, so I mainly look at Sports section.

40.   I do not use a computer or computer software. I have no email address.

41.   I do not know how to look at the recorded title to the four properties of the four Debtors and have never seen how it is done.

42.   I never knew about any of the Pensco notes and mortgages until 3 of them were brought to my attention by my attorney when preparing to file bankruptcy petitions for the four

10

47.   The threat of losing my livelihood, net worth, and community forced and coerced me, with duress, into agreeing to whatever CFA said I had to sign in order to enter into negotiations with CFA to try to settle the foreclosure action without my loss of possession of the four properties.  I had already lost my wife, having separated because of her unauthorized activity in placing the Independence/Sovereign mortgage on the properties; and I was realizing the same loss as to my son Henry, when gradually coming to understand what he did to me, in creating the $8,000,000 CFA loan calling for payments of $89,834.35 per month when the properties were pulling in gross of only $90,000 per month. The CFA loan (for Henry's personal benefit to the extent of more than $1,000,000) from the outset was going to be in default, causing a default rate of interest of $160,000 per month to be paid in addition to any principal payments, thereby ensuring that the Debtors would wind up in bankruptcy unless I could negotiate with CFA to restructure the wholly unauthorized loan and avoid foreclosure, sale and bankruptcy. These are the reasons I had for signing the December 5, 2008 letter and signing it in the way that CFA demanded, with Henry Vargas signing for the Debtors. CFA knew that he had no authorization to do this, but I was forced into getting his signature on the letter, and mine giving my "consent" or CFA would not meet with me and my attorney (Mr. Person) to try to settle the CFA foreclosure action.

Executed on July 11, 2009 at New York, New York.

By: _____
         Victor Vargas, as Sole Shareholder and
         President of the Debtors and Debtors in Possession



Positive
As of: June 6, 2013 12:09 PM EDT

## Vargas **Realty** Enters. v. CFA W. 111 St., L.L.C. (In re Vargas **Realty** Enters.)

United States District Court for the Southern District of New York
November 1, 2010, Decided; November 2, 2010, Filed
No 09 Civ. 8136 (RJS)

**Reporter:** 440 B.R. 224; 2010 U.S. Dist. LEXIS 116366

IN RE VARGAS REALTY ENTERPRISES, INC.; VARGAS REALTY ENTERPRISES, INC., NOBLE REALTY CORP., V& R REALTY CORP., E.R. PROPERTIES, INC., Appellants, VERSUS CFA W. 111 STREET, L.L.C., Appellee.

**Prior History:** _In re_ Vargas Realty Enters., 2009 Bankr. LEXIS 2040 (Bankr. S.D.N.Y., July 23, 2009)

| Core Terms |
| --- |

mortgage, negotiations, ratified, bankruptcy court, subordination, adhesion contract, settlement, equitable, interest rate, invalid, fraudulent conveyance, unauthorized, bargaining, fraudulent, public policy, defaulted, settlement discussions, first time, foreclosure, undisputed, confirmed, foreclosure action, unauthorized act, pre-negotiation, duress

**Counsel:** [**1] For Appellants: Carl E. Person, New York, New York.

For Appellee: David Lawrence Birch, Hofheimer, Gartlir & Gross, LLP, New York, New York.

**Judges:** RICHARD J. SULLIVAN, United States District Judge.

**Opinion by:** RICHARD J. SULLIVAN

| Opinion |
| --- |

[*230] OPINION AND ORDER

Richard J. Sullivan, District Judge:

Vargas Realty Enterprises, Inc., Noble Realty Corp., V & R Realty Corp., and E.R. Properties, Inc. (collectively, "Appellants") appeal the August 3, 2009 Order of the Honorable Stuart M. Bernstein, Bankruptcy Judge, (the "August 2009 Order"), granting the motion of CFA W. 111 Street, L.L.C. ("CFA" or "Appellee") to dismiss Appellants' Amended Adversary Complaint. Appellants assert that the Bankruptcy Court erred in its conclusions of law and offer at least two new arguments against Appellee on appeal. For the reasons set forth below, the August 2009 Order is affirmed.

I. BACKGROUND

A. FACTS

Appellants are corporations that own real property on 111th Street in New York City. (Joint Appendix ("J.A.") at 65 ¶ 35; 344.) Victor Vargas is the sole shareholder and president of each Appellant company. (_Id._ at 56.) Since 2001, Victor Vargas's then-spouse, Rosa Vargas, and son, Henry Vargas, held themselves out to be agents of Appellants [**2] on at least five separate occasions. (_Id._ at 56 ¶ 5A; 58 ¶¶ 8, 12; 59 ¶ 16; 60 ¶ 24.) Appellants maintain that neither Rosa Vargas nor Henry Vargas was ever an officer, director, shareholder, manager, agent or employee of Appellants. (_Id._ at 57 ¶ 5D; 58 ¶ 7; 59 ¶ 16; 62 ¶ 30; 64 ¶¶ 34E, 34F.) However, on each of these occasions, Rosa

440 B.R. 224, *230; 2010 U.S. Dist. LEXIS 116366, **2

or Henry Vargas carried out a loan transaction with a financial institution purporting to be Appellants' agent and created a lien against Appellants' properties. (*Id.* at 56 ¶ 5A; 58 ¶¶ 8, 12; 59 ¶ 16; 60 ¶ 24.) Each transaction was carried out without Victor Vargas's prior consent or knowledge. (*Id.*) Nevertheless, upon learning of the unauthorized transactions, Victor Vargas accepted the resulting obligations on every occasion and never took steps to invalidate them. (*Id.* at 57 ¶ 5C; 58 ¶ 10; 59 ¶¶ 15, 19; 60 ¶ 21.)

In January 2007, Rosa Vargas, purporting to be vice president of Appellants, entered into a loan refinancing transaction with Sovereign Bank at the behest of Henry Vargas, who arranged the loan. (*Id.* at 59 ¶¶ 16-18.) As in the past, once Victor Vargas learned of the transaction, he complied with its obligations and did not attempt to undo it. [**3] (*Id.* at 59 ¶ 19; 60 ¶ 22.) According to Appellants, Henry Vargas arranged the transaction for his own personal benefit. (*Id.* at 59 ¶ 18.) Victor Vargas contends that he approved this and the preceding transactions because he believed the properties could remain viable under the loan obligations and he sought to avoid adverse consequences for his son. (*Id.* at 59 ¶ 19; 60 ¶ 21.)

On August 28, 2007, Henry Vargas again held himself out to be Appellants' agent and executed a promissory note for the principal amount of $8,000,000. [1] (*Id.* at 60 [*231] ¶¶ 24, 25; 104-115.) The note was made out to CFA and was secured by Appellants' real properties. (*Id.* at 60 ¶ 26.) At that time, Appellants did not need additional funds from an operating standpoint. (*Id.* at 61 ¶ 25; 62 ¶¶ 26-27; 345.) Although the record is unclear as to how much of the CFA loan benefitted Appellants, the following facts are undisputed: (1) at least $400,000 was used to satisfy the interest payments for the first five months (*id.* at 61 ¶ 24); (2) a large portion of the loan — approximately $5,000,000 — was used to satisfy Appellants' prior debt to Sovereign Bank (*id.* at 61

¶ 29); and (3) approximately $1,000,000 was paid to a corporation [**4] owned by Henry Vargas (*id.* at 62 ¶ 29). The interest rate (12.25%) on the CFA note was twice the rate (6.125%) of the Sovereign Bank loan with a default rate of interest of 24%. (*Id.* at 60 ¶ 21; 61 ¶ 27.)

On April 1, 2008, Appellants defaulted on their repayment obligations to CFA. (*Id.* at 87 ¶ 7.) Thereafter, in the summer of 2008, Appellee filed a foreclosure action in New York State Supreme Court against Appellants for defaulting on the CFA note, and obtained appointment of a receiver. (Appellants' Br. at 3; Appellee's Br. at 2.) Although Victor Vargas became aware that a "refinancing" had cleared Appellants' debt to Sovereign Bank shortly after September 2007, Appellants claim that Victor Vargas did not learn of the CFA note and mortgage until CFA brought the foreclosure proceeding against Appellants. (*Id.* at 61 ¶¶ 24, 24A.)

In order to avoid [**5] foreclosure and in an effort to reach a settlement or restructuring of the note and mortgage, Appellants executed a pre-negotiation agreement with Appellee (the "Pre-Negotiation Agreement" or the "Agreement"). (Appellants' Br. at 3; Appellee's Br. at 2; J.A. at 335-36.) The Agreement, *inter alia*, confirmed Appellants' obligations under the loan. (Appellants' Br. at 3; Appellee's Br. at 2; J.A. at 335-36.) Both parties concede that as a condition to entering into any settlement discussions, CFA insisted that Appellants execute the Agreement. (Appellants' Br. at 3; Appellee's Br. at 2; J.A. at 335-36.) On December 5, 2008, both Victor and Henry Vargas signed the Agreement on Appellants' behalf with counsel present. (Appellants' Br. at 3; Appellee's Br. at 2-3.) The Agreement confirmed Appellants' "legal and enforceable obligations" under the loan as well as their waiver of "any defenses, counterclaims or offsets," including any that could potentially be raised in the foreclosure action. (J.A. at 76 ¶ 7.) The Agreement makes

[1] Appellants refer to September 14, 2007 as the date when Henry Vargas executed the CFA note and mortgage (*id.* at 60 ¶¶ 24, 25), while Appellee dates the same event as August 28, 2007 (*id.* at 87 ¶¶ 3, 4). The Court adopts the latter date in this opinion because the Consolidated Secured Promissory Note is dated August 28, 2007. (*Id.* at 104-15.)

Case 1:13-cv-04699-KBF   Document 2   Filed 07/03/13   Page 23 of 33

Page 3 of 13

440 B.R. 224, *231; 2010 U.S. Dist. LEXIS 116366, **5

clear that Appellee did not waive its "rights or remedies including the right to demand immediate payment of all sums due under the Loan Documents." (*Id.* at 76 ¶ [**6] 5.) The Agreement also provides that "[b]oth Borrower and Lender have reviewed th[e] letter agreement with counsel, understand the agreements contained [t]herein, and have agreed to execute and deliver th[e] letter agreement as its own free act and deed without duress." (*Id.* at 77 ¶ 11.)

After attempting to negotiate a settlement for approximately two months (*id.* at 333), the parties were unable to reach a resolution of the matter (*id.* at 335). On January 29, 2009, Appellants voluntarily filed a Chapter 11 petition in the United States Bankruptcy Court for the Southern District of New York and requested a stay of Appellee's foreclosure action. (*Id.* at 338.)

B. Procedural History

On May 25, 2009, Appellants commenced the present adversary proceedings before [*232] the Honorable Stuart M. Bernstein, Bankruptcy Judge. (*Id.* at 25.) On June 11, 2009, Appellants amended the four adversary complaints. [2] (*Id.* at 73.) Appellants' Amended Adversary Complaint requested the following: (1) that the CFA note and mortgage be declared invalid and unenforceable because Henry Vargas lacked authority to execute the deal and CFA failed to perform due diligence; (2) that the Pre-Negotiation Agreement be nullified [**7] as a fraudulent conveyance, preference payment, contract of adhesion, and/or invalid contract for lack of consideration; and/or (3) that CFA's claim be equitably subordinated to all other creditors because CFA procured the deal through fraud or misconduct. (*Id.* at 55-73.) On July 1, 2009, Appellee moved to dismiss the Amended Adversary Complaint pursuant to *11 U.S.C. §§ 105(a)*, *510(c)*, *547*; *Federal Rule of Bankruptcy Procedure 7012*; and *Federal Rule of Civil Procedure 12(b)(6)*. (*Id.* at 85-102.) Appellee argued that, to the extent Henry Vargas may have lacked authority, Appel-

lants ratified the CFA note and mortgage when they executed the Pre-Negotiation Agreement and Appellants failed to assert a valid basis upon which the Agreement could be nullified. (*Id.*)

Following oral argument on July 23, 2009, the Bankruptcy Court dismissed the consolidated adversary action against Appellee. (*Id.* at 344.) Judge Bernstein concluded as follows: (1) Appellants ratified the CFA note and mortgage when Victor Vargas [**8] executed the Pre-Negotiation Agreement after reviewing it with counsel and when Appellants accepted at least a partial benefit of the transaction (*id.* at 346-51); (2) the Pre-Negotiation Agreement was not a fraudulent conveyance because it was not a transfer and, even if it could be construed as one, Appellants could not satisfy the requisite elements necessary to make a fraudulent conveyance claim (*id.* at 351-52); (3) Appellants failed to plead all of the elements of an unlawful preference claim (*id.* at 352-53); (4) CFA's use of its position to drive a harder bargain was not wrongful conduct warranting equitable subordination of its claim (*id.* at 353-55); and finally, (5) the Pre-Negotiation Agreement was neither a product of coercion or duress nor a contract of adhesion because Appellants had other alternatives to signing it, such as rejecting the Agreement or filing a Chapter 11 case sooner (*id.* at 355-57).

On November 13, 2009, Appellants appealed the August 2009 Order to this Court, requesting its reversal and either a remand for further pre-trial proceedings or a declaration that the CFA note and mortgage are void. (Appellants' Br. at 25.)

II. Standard of Review

Pursuant to *28 U.S.C. § 158(a)(1)*, [**9] district courts are vested with jurisdiction to hear appeals from final judgments, orders, and decrees of bankruptcy courts. The district court evaluates the bankruptcy court's findings of fact for clear error and its conclusions of law *de novo*. *In re Bennett Funding Group, Inc.*, 146

---

[2]  The separate cases were consolidated by an Order of the Bankruptcy Court (*id.* at 332), and have also been consolidated for the purposes of this appeal by an Order of the Court (Doc. No. 5).

440 B.R. 224, *232; 2010 U.S. Dist. LEXIS 116366, **9

F.3d 136, 138 (2d Cir. 1998). Because the sufficiency of a complaint under *Rule 12(b)(6)* is a question of law, *Goldberg v. Danaher*, 599 F.3d 181, 183-84 (2d Cir. 2010), the Court reviews the Bankruptcy Court's decision to grant the motion to dismiss *de novo*. *See Raine v. Lorimar Prods., Inc.*, 71 B.R. 450, 452 (S.D.N.Y. 1987) (reviewing *de novo* a bankruptcy court's dismissal of a complaint for failure to state a claim).

[*233] On a motion to dismiss under *Rule 12(b)(6)*, the Court must draw all reasonable inferences in plaintiffs' favor. *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007). Nonetheless, "[f]actual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007) (citation omitted). "*Rule 8* marks a notable and generous departure from the [**10] hyper-technical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1950, 173 L. Ed. 2d 868 (2009). Therefore, this standard "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* at 1949.

Ultimately, plaintiffs must allege "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S. Ct. at 1949. On the other hand, "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* (quoting *Twombly*, 550 U.S. at 555). Where plaintiffs "have not nudged their claims across the line from conceivable to plausible, their complaint must be dismissed." *Twombly*, 550 U.S. at 570.

III. DISCUSSION

Appellants allege for the first time on appeal that the CFA note [**11] and mortgage were criminally usurious and executed as part of a criminal scheme by Appellee to take over Appellants' properties. (Appellants' Br. at 8-11.) Appellants also argue that the Bankruptcy Court erred in finding that Appellants ratified the CFA note and mortgage through their execution of the Pre-Negotiation Agreement. Appellants contend that the Pre-Negotiation Agreement is not enforceable because it lacked consideration, is a contract of adhesion, amounted to a fraudulent conveyance, and/or violated public policy. (*Id.* at 11-25.) Lastly, Appellants request that Appellee's claim be equitably subordinated to all other claims based on Appellee's inequitable conduct. (*Id.* at 23-24.)

Having carefully reviewed the record, the Court finds that the Bankruptcy Court properly granted Appellee's motion to dismiss all of the claims pleaded in the Amended Adversary Complaint. Accordingly, the August 2009 Order is hereby affirmed.

A. The CFA Note and Mortgage

1. Criminal Usury

Appellants advance a claim of criminal usury for the first time on appeal. (*Id.* at 8-11.) Generally, an appellate court will not consider a claim that is raised for the first time on appeal. *See In re Worldcom, Inc.*, No. 07 Civ. 3408 (DLC), 2007 U.S. Dist. LEXIS 67669, 2007 WL 2682882, at *8 (S.D.N.Y. Sept. 14, 2007) [**12] (finding that appellant's failure to raise a claim before the Bankruptcy Court served as a waiver of that claim since appellant had ample opportunity to present the claim below); *see also Singleton v. Wulff*, 428 U.S. 106, 120, 96 S. Ct. 2868, 49 L. Ed. 2d 826 (1976); *Schmidt v. Polish People's Republic*, 742 F.2d 67, 70 (2d Cir. 1984). "This is true whether the appeal follows a full factual trial or whether the new appellate claim is a purely legal question following a summary dismissal [*234] proceeding." *Schmidt*, 742 F.2d at 70 (citation omitted). However, a court sitting on the appellate level has discretion to hear a new issue when necessary to avoid a manifest injustice or

440 B.R. 224, *234; 2010 U.S. Dist. LEXIS 116366, **12

where the issue is purely legal and does not require additional fact-finding. *See Matar v. Dichter*, 563 F.3d 9, 13 n.4 (2d Cir. 2009) (citation omitted); *see also Singleton*, 428 U.S. at 121; *List v. Fashion Park, Inc.*, 340 F.2d 457, 461 (2d Cir. 1965); *Sapir v. Sartorius*, 230 B.R. 650, 653 (S.D.N.Y. 1999). Because Appellants' claim that the CFA loan was criminally usurious is a purely legal issue that does not require further fact-finding, the Court will exercise its discretion to examine the claim.

Appellants charge that the CFA note and mortgage were [**13] criminally usurious under *New York Penal Law § 190.40* and *New York General Obligations Law §§ 5-511*, 5-501-1, and 5-501-6-a. (Appellants' Br. at 8.) Under those statutes, an entity is guilty of criminal usury if it knowingly charges an interest rate on a loan or forbearance in excess of 25%. *N.Y. Penal Law §§ 190.40, 190.42*. However, the provisions regulating the maximum rate of interest do not apply to "any loan or forbearance in the amount of two million five hundred thousand dollars or more," *N.Y. Gen. Oblig. Law § 5-501(6)(b)*, or to interest rates on defaulted obligations, *see Manfra, Tordella & Brookes, Inc. v. Bunge*, 794 F.2d 61, 63 n.3 (2d Cir. 1986) (holding that the New York usury laws do not apply to interest charged on past due debts).

Contrary to Appellants' assertions, the CFA note and mortgage were not criminally usurious under New York law. According to the terms of the CFA note, the pre-default interest rate on the CFA loan was 12.25% per annum (J.A. at 105), and the default interest rate was 24% per annum (*id.* at 107). Therefore, both interest rates are clearly below the statutory limit. As to Appellants' claim that the interest rates reflected on the note are inaccurate, [**14] *New York General Obligations Law § 5-501(6)(b)* precludes this loan from the maximum interest rate restrictions because it ex-

ceeds $2,500,000. [3] The CFA note, though made out to four borrowers, represented a "single note" in the principal amount of $8,000,000 (J.A. at 116), and not four separate notes, each under $2,500,000, as Appellants allege (Appellants' Br. at 9). Moreover, because New York's criminal usury laws do not apply to interest rates on defaulted obligations, *see Manfra, Tordella & Brookes*, 794 F.2d at 63 n.3, Appellants' claim that the defaulted interest rate is criminally usurious is simply incorrect.

2. Ratification

Appellants also challenge the validity of the underlying CFA note and mortgage, arguing that Henry Vargas was not authorized to enter into a loan transaction with Appellee on Appellants' behalf. (Appellants' Br. at 2-3.) Whether or not Henry Vargas had actual or apparent authority to enter into such transactions, Appellants ratified the transaction when they executed [*235] the Pre-Negotiation Agreement, rendering the note and mortgage valid and enforceable against Appellants.

"Ratification is the express or implied adoption, *i.e.*, recognition and approval, of the unauthorized acts of another." *Orix Credit Alliance v. Phillips-Mahnen, Inc.*, No. 89 Civ. 8376 (THK), 1993 U.S. Dist. LEXIS 7071, 1993 WL 183766, at *4 (S.D.N.Y. May 26, 1993). "Under New York law, a principal can be held liable for the unauthorized acts of an agent that the principal later ratifies." *RLI Ins. Co. v. Athan Contracting Corp.*, 667 F. Supp. 2d 229, 235 (E.D.N.Y. 2009); *see Marqusee v. Hartford Fire Ins. Co.*, 198 F. 475, 477 (2d Cir. 1912) ("[O]ne may ratify an unauthorized contract made on [**16] his behalf and [] the effect is the same as if he had himself originally made the contract."). "Ratification requires acceptance by the principal of the benefits of an agent's acts, with full knowledge of the facts,

[3] Appellants contend that the 24% default interest rate reflected by the CFA note is inaccurate because the 24% figure is based on an interest payment of $160,000 per month pursuant to an $8,000,000 loan. Appellants argue that they did not actually receive the full $8,000,000. Therefore, Appellants contend that when the $160,000 per month charge is calculated based on the amount actually received (either the $5,235,174.40 paid to Sovereign Bank, or $6,864,908.91, which represents the $1,135,591.09 paid to Henry Vargas in addition to the amount paid to Sovereign Bank), the [**15] interest rate is actually 36.67% or 27.97%, respectively, and in violation of *New York Penal Law §§ 190.40, 190.42*. (Appellants' Br. at 8-9.)

440 B.R. 224, *235; 2010 U.S. Dist. LEXIS 116366, **16

in circumstances indicating an intention to adopt the unauthorized arrangement." *Monarch Ins. Co. of Ohio v. Ins. Corp. of Ir. Ltd.*, 835 F.2d 32, 36 (2d Cir. 1987). Ratification also occurs when a principal fails to object to the unauthorized act of another, despite an opportunity to do so. *See Phillips-Mahnen*, 1993 U.S. Dist. LEXIS 7071, 1993 WL 183766, at *5; *see also RLI Ins. Co.*, 667 F. Supp. 2d at 235 ("[W]here the principal knows of an unauthorized act taken on his behalf and remains silent, he is deemed to have ratified the act" (internal quotation marks and citation omitted).). A principal may ratify even those unauthorized acts deemed to be fraudulent. *See Prudential Ins. Co. of Am. v. BMC Indus., Inc.*, 630 F. Supp. 1298, 1300 (S.D.N.Y. 1986); [4] *see also HSBC Bank USA, Nat'l Ass'n v. Adelphia Commc'ns Corp.*, No. 07 Civ. 553A (RJA), 2009 U.S. Dist. LEXIS 10675, 2009 WL 385474, at *6 (W.D.N.Y. Feb. 12, 2009) ("The doctrine of ratification applies to transactions sought to be avoided as fraudulent transfers.").

It is undisputed that Victor Vargas eventually became aware that his son, Henry Vargas, had carried out the CFA note and mortgage transaction on Appellants' behalf and that Victor Vargas then entered into a Pre-Negotiation Agreement that confirmed Appellants' obligations under that note. Whether or not Henry Vargas lacked actual or [**18] apparent authority to execute a valid loan on behalf of Appellants, Appellants thereafter ratified the underlying note and mortgage transaction twice: first, when Appellants failed to object or attempt to undo the transaction upon learning of it; and, second, when Appellants executed a Pre-Negotiation Agreement that acknowledged their "legal and enforceable obligations" to Ap-

pellee under the CFA note and mortgage "without any defenses, counterclaims or offsets." (J.A. at 76 ¶ 7.)

Appellants allege that Victor Vargas did not learn of the CFA note and mortgage until approximately a year after it was recorded. (*Id.* at 61.) This was despite the fact that in the interim Victor Vargas [*236] became aware that a "refinancing" had taken place large enough to satisfy a prior $5,000,000 debt to Sovereign Bank. (*Id.*) Once Victor Vargas undisputedly discovered that his son had carried out the unauthorized dealing, the record does not indicate that Victor Vargas either challenged or attempted to invalidate the transaction. (*Id.* at 59 ¶¶ 15, 19.) Appellants concede that at least twice in the recent past Victor Vargas had acquiesced to other unauthorized transactions entered into by his son through inaction. [**19] (*Id.*) Similarly, Appellants' decision to remain silent upon learning of the CFA note and mortgage served to ratify that transaction.

Indeed, rather than seize upon an opportunity to object to the CFA note and mortgage, Appellants took actions manifesting their intent to ratify the allegedly unauthorized transaction. First, Appellants accepted the benefits of the transaction. It is undisputed that at least $5,000,000 of the $8,000,000 CFA loan was used to satisfy a prior debt owed to Sovereign Bank and that at least $400,000 was used to make interest payments on behalf of Appellants. (Appellants' Br. at 4.) The Bankruptcy Court concluded that Appellants had received "a substantial amount" of the note proceeds, "possibly as much as seven million dollars at closing." (J.A. at 350.) There is nothing in the record to indicate that Appellants ever attempted

---

[4] In an action [**17] for rescission based on fraud, this court has stated that waiver will be found where, subsequent to the discovery of the fraud, the party later claiming a right to rescind has continued to accept the benefits of the agreement or acted in some other fashion inconsistent with exercise of a right to rescind. A waiver requires the intentional relinquishment of a known right with both knowledge of its existence and an intention to relinquish it. Ratification results when a party to a voidable contract accepts benefits flowing from the contract, or remains silent, or acquiesces in contract for any considerable length of time after he has opportunity to annul or void the contract. By her own acts or words, a party may ratify what would otherwise be a questionable contract.

*Prudential Ins. Co.*, 630 F. Supp. at 1300 (internal quotation marks and citations omitted).

to forego these benefits. Second, Appellants possessed full knowledge of the facts when they executed the Pre-Negotiation Agreement. Appellants concede that they were aware of the allegedly fraudulent nature of the underlying loan when they entered into the Agreement, which explicitly confirmed their obligations under that loan. (*Id.* at 76 [**20] ¶ 7.) Moreover, it is undisputed that Appellants were represented by counsel, who was actually present when Appellants signed the Agreement confirming their legal obligations under the loan. (Appellee's Br. at 19; J.A. at 346.) Further, the circumstances surrounding the execution of the Agreement indicate that Appellants intended to ratify the CFA note and mortgage. Appellants signed the Pre-Negotiation Agreement in exchange for Appellee's agreement to participate in negotiations relating to the disposal or restructuring of the CFA note and mortgage. (J.A. at 75-81.) Accordingly, absent a finding that the Pre-Negotiation Agreement is invalid or unenforceable, Appellants' failure to object after learning of the CFA note and mortgage and their subsequent entry into an agreement confirming their obligations under the CFA loan served as proper ratification of the underlying loan transaction.

B. The Pre-Negotiation Agreement

Appellants next challenge the Bankruptcy Court's finding that the Pre-Negotiation Agreement was a valid and enforceable contract. Appellants contend that the Pre-Negotiation Agreement was not valid because it lacked consideration, was a contract of adhesion induced by [**21] coercion or duress, was part of a criminal enterprise, amounted to a fraudulent conveyance, and/or was against public policy. (Appellants' Br. at 10-25.) Appellants further request that Appellee's claim be equitably subordinated. (*Id.* at 23-24.) For the reasons set forth below, we affirm the Bankruptcy Court's findings and deny Appellants' request for equitable subordination.

1. Consideration

Appellants allege that the Pre-Negotiation Agreement lacked consideration. Under New York law, all contracts must be supported by consideration, defined simply as "a bargained-for exchange of promises or performance." *Ferguson v. Lion Holding, Inc.*, 312 F. Supp. 2d 484, 494 (S.D.N.Y. 2004) (citing *Restatement* [*237] (Second) of Contracts § 71 (1981)). To this end, it is well settled that parties are free to set the terms of a contract as they see fit "even if the consideration exchanged is grossly unequal or of dubious value, the operative factor being whether the promised consideration is acceptable to the promisee." *Goldston v. Bandwidth Tech. Corp.*, 52 A.D.3d 360, 859 N.Y.S.2d 651, 657 (App. Div. 2008) (internal quotation marks and citations omitted). The law is equally clear that a bargained-for agreement to negotiate [**22] when there is no legal obligation to do so is fair consideration. *See Mass. Mut. Life Ins. Co. v. Gramercy Twins Assocs.*, 199 A.D.2d 214, 606 N.Y.S.2d 158, 160 (App. Div. 1993) ("The promise to negotiate can not be equated with a promise to finalize an agreement. . . . All that plaintiff promised defendant was an opportunity to negotiate a settlement. The bargain was fulfilled" when the parties negotiated.); *see also Fed. Home Loan Mortgage Corp. v. Drofan Realty Corp.*, No. 95 Civ. 5858 (RPP), 1996 U.S. Dist. LEXIS 345, 1996 WL 15680, at *1-3 (S.D.N.Y. Jan. 17, 1996) (enforcing the terms of parties' agreement to engage in negotiations); *U.S. Bank Nat'l Ass'n v. 23rd St. Dev., LLC*, 25 Misc. 3d 1214[A], 901 N.Y.S.2d 911, 2009 NY Slip Op 52093[U], 2009 WL 3337595, at *3 (N.Y. Sup. Ct. 2009) (finding a pre-negotiation agreement valid, even where negotiations could be terminated "for any reason or no reason" under the contract).

Here, there can be little dispute that Appellants' execution of the Pre-Negotiation Agreement in exchange for Appellee's agreement to engage in settlement negotiations served as valid consideration. Appellants concede that they signed the Agreement with the understanding that Appellee would thereafter negotiate a possible settlement with Appellants. [**23] (J.A. at 68.) The Bankruptcy Court correctly noted that Appellee had no legal obligation to participate in settlement negotiations (*id.* at 352), and Appellee's decision to do so

Case 1:13-cv-04699-KBF   Document 2   Filed 07/03/13   Page 28 of 33

Page 8 of 13

440 B.R. 224, *237; 2010 U.S. Dist. LEXIS 116366, **23

was likely motivated by its desire "to drive a harder bargain than the debtors preferred" (id. at 354). Moreover, Appellants do not provide details or assert facts that suggest Appellee did not engage in the bargained-for negotiations in good faith. Accordingly, there is no basis for disturbing the Bankruptcy Court's conclusion that Appellee's agreement to engage in settlement negotiations, which the parties did in fact engage in (id. at 199), provided fair consideration. That the bargained-for negotiations did not end favorably for Appellants does not now transform the Agreement into an unenforceable contract.

2. Contract of Adhesion and Coercion

Similarly, the Pre-Negotiation Agreement does not constitute an impermissible contract of adhesion. "The elements of a contract of adhesion are (1) a necessity of life; (2) a contract for the excessive benefit of the offeror; (3) an economic or other advantage of the offeror; and (4) the offer of the proposed contract on a take-it-or-leave-it basis." Weidman v. Tomaselli, 81 Misc. 2d 328, 365 N.Y.S.2d 681, 686 (Co. Ct. 1975), [**24] aff'd 84 Misc. 2d 782, 386 N.Y.S.2d 276 (App. Term 1975). "Typical contracts of adhesion are standard-form contracts offered by large, economically powerful corporations to unrepresented, uneducated, and needy individuals on a take-it-or-leave-it basis, with no opportunity to change the contract's terms." Klos v. Polskie Linie Lotnicze, 133 F.3d 164, 168 (2d Cir. 1997) (citation omitted). However, the fact that a form is offered on a take-it-or-leave-it basis, standing alone, is insufficient to render a contract invalid. Anonymous v. JP Morgan Chase & Co., No. 05 Civ. 2442 (JGK), 2005 U.S. Dist. LEXIS 26083, 2005 WL 2861589, at *6 (S.D.N.Y. Oct. 29, 2005). Nor is mere disparity in bargaining power sufficient to show that a contract of adhesion exists. Ranieri v. Bell Atl. Mobile, 304 A.D.2d 353, [*238] 759 N.Y.S.2d 448, 449 (App. Div. 2003). Rather, a party seeking to rescind an alleged contract of adhesion must show that the other party "used 'high pressure tactics' or 'deceptive language' or that the contract is unconscionable." Klos, 133 F.3d at 168 (citation omitted). Absent such a showing, a court will not interfere with an otherwise valid agreement.

Clearly, Appellants have failed to demonstrate that the Pre-Negotiation Agreement was a contract [**25] of adhesion. (Apellants' Br. at 12 -16.) Contrary to Appellants' contention, the business investments at issue do not qualify as a "necessity of life." While they appear to have been lucrative investments (id. at 12), Appellants do not even assert that the four relevant real properties constituted Victor Vargas's only means of income. As the Bankruptcy Court noted, necessities of life include "food, shelter, clothing, medicine and basic similar personal needs," and do not include business investments. (J.A. at 356.)

In any event, Appellants also do not satisfy the remaining elements for a contract of adhesion. Appellants cannot fault Appellee for using its full bargaining position to achieve a favorable agreement where the contract is otherwise valid. Even harsh or unfair terms, from the offeree's view, do not transform an enforceable agreement into a contract of adhesion where an offeree could have made a counteroffer or rejected the offer. Weidman, 365 N.Y.S.2d at 686-87. Thus, the Bankruptcy Court correctly determined that the Agreement was not a contract of adhesion because, inter alia, Victor Vargas faced alternatives to signing it. (J.A. at 356.) For example, Appellants could have [**26] rejected the terms of the Agreement and fought the foreclosure or filed a Chapter 11 case sooner. (Id.)

Moreover, the facts do not show that the disparity in bargaining power was such that Appellee coerced Victor Vargas into signing the Agreement under duress. The law is clear that "the fact that a party may have engaged in hard bargaining is insufficient to establish duress." Orix Credit Alliance, Inc. v. Bell Realty, Inc., No. 93 Civ. 4949 (LAP), 1995 U.S. Dist. LEXIS 12255, 1995 WL 505891, at *4 (S.D.N.Y. July 27, 1995). One must show that there existed an unlawful threat that precluded a party's exercise of free will. Id. Here, Appellants were admittedly in a difficult bargaining position when presented with the Pre-Negotiation Agreement. However, this fact does not

440 B.R. 224, *238; 2010 U.S. Dist. LEXIS 116366, **26

make the Agreement deficient. Victor Vargas was not an unrepresented or needy individual. Rather, he was the president and sole shareholder of at least four businesses and had been in the real estate profession for approximately 40 years. (J.A. at 56; 227 ¶ 38.) Additionally, his decision to execute the Pre-Negotiation Agreement on behalf of Appellants was freely made and executed with the assistance of counsel, who presumably made him aware of [**27] the terms and consequences of signing the contract. [5] (Appellee's Br. at 14; J.A. at 346.)

Put simply, Appellants have failed to state any facts that support a claim of contract of adhesion. Rather, the facts indicate that Appellants made a calculated and strategic decision under advice of counsel to execute the Pre-Negotiation Agreement in an effort to negotiate a more favorable settlement with Appellee and avoid foreclosure. (Appellants' Br. at 10.) [*239] Accordingly, the Court concurs with the Bankruptcy Court and refuses to declare the Agreement null on the basis of this claim.

3. Criminal Enterprise

Appellants argue for the first time on appeal that the Pre-Negotiation Agreement, along with the underlying CFA note and mortgage, were part of Appellee's criminal scheme to take over Appellants' properties. (Id. at 10-11.) Specifically, Appellants allege that:

> [T]he known facts show predatory lending, impossible terms, kickback to a third person . . . , failure to do any due diligence, immediate filing of foreclosure [**28] without any notice to or communication with the Debtors, and the scheme or requiring the Debtors in the Pre-Negotiation Agreement to waive all of their defenses to the foreclosure action as a prior condition to being able to

talk settlement with CFA, and using the [A]greement to attempt to terminate the Debtor's rights in the Bankruptcy Court to vacate CFA's illegally-acquired note and mortgage.

(Id.)

The entirety of Appellants' argument is conclusory. Appellants do not direct the Court to a single case or fact that would substantiate this Amended Adversary Complaint. Nor does the Amended Adversary Complaint allude to the possibility that a criminal scheme was underway. Thus, Appellants have not stated a viable claim of criminal enterprise upon which relief can be granted.

Moreover, as stated above, the Court will not consider a claim raised for the first time on appeal unless a manifest injustice would result or the issue is purely legal. See Matar, 563 F.3d at 13 n.4. Generally, where a party clearly had the opportunity to raise the claim below, no manifest injustice would result from an appellate court's refusal to hear the claim for the first time on appeal. See Mellon Bank, N.A. v. United Bank Corp. of N.Y., 31 F.3d 113, 116 (2d Cir. 1994). [**29] Appellants clearly had the opportunity to raise this issue below given that their allegations in support of a claim of criminal enterprise are merely derivatives of Appellants' other theories. Accordingly, the Court finds no need to further examine this claim.

4. Fraudulent Transfer

Appellants also contend that, because the underlying CFA note and mortgage were not valid, the execution of the Pre-Negotiation Agreement amounted to the transfer of a property right — in the form of a lien on Appellants' properties — to Appellee. (Appellants' Br. at 18.) They allege that this transfer was a fraudulent one pursuant to New York Debtor and Creditor Law §§ 270, et seq., because the basis

---

[5] Upon executing the Pre-Negotiation Agreement, both parties confirmed that they had reviewed it with counsel and understood the agreements contained therein. (J.A. at 77 ¶ 11.)

440 B.R. 224, *239; 2010 U.S. Dist. LEXIS 116366, **29

of the Agreement — the CFA note and mortgage — was invalid. [6] (*Id.*) This argument is baseless and is premised on at least two false assumptions: (1) that the underlying CFA note and mortgage were invalid (*id.*); and (2) that the Pre-Negotiation Agreement constituted a "transfer," as it conferred a property right upon Appellee (*id.* at 11-12, 17-23).

First, the Court has already dismissed each of Appellants' theories offered in support of the first assumption. *See supra* Part III.A. Thus, there can be no basis for believing that the CFA note and mortgage were invalid.

Second, the Pre-Negotiation Agreement did not constitute a transfer of a property [*240] right. Appellants claim that the "right to defend a foreclosure action brought against a Debtor's real property is an intangible property right," but fail to state why this is so. (Appellants' Br. at 12.) Appellants further argue that the release of a property right through an agreement constitutes a transfer of that property right. (*Id.*) The Court finds instead that the Pre-Negotiation Agreement constituted a contract, through which Appellants ratified a prior transaction. Therefore, even if the CFA note and mortgage were in fact invalid, Appellants' argument would still fail because a ratification of a former transaction is clearly not a transfer within the meaning of the fraudulent conveyance statutes. By the time ratification occurs, the unauthorized or voidable transfer transaction has already been completed and, at that point, may only be voided or ratified. *See In re Best Prods. Co., Inc.*, 168 B.R. 35, 57 (Bankr. S.D.N.Y. 1994) [**31] ("A fraudulent transfer is not void, but voidable; thus, it can be ratified by a creditor who is then estopped from seeking its avoidance."); *see also Cohen v. Treuhold Capital Group, LLC (In re Cohen)*, 422 B.R. 350, 371 (E.D.N.Y. 2010) (holding that an unauthorized property transfer effectuated by an agent and not evidenced by a signed writing could be subsequently ratified by the principal). When Appellants executed the Agreement, any transfer

that occurred was already completed. Thus, the execution of the Pre-Negotiation Agreement did not "create" a lien; it merely ratified the prior transaction. (J.A. at 351.)

Moreover, Appellants have failed to demonstrate that there was anything fraudulent about the transactions at issue. Under New York law:

> [A] person challenging a transfer of the debtor's property as constructively fraudulent . . . must show that it was made without fair consideration and (1) the debtor was insolvent or was rendered insolvent by the transfer, *NYDCL § 273*, (2) the debtor was left with unreasonably small capital, *id.*, *§ 274*, or (3) the debtor intended or believed that it would incur debts beyond its ability to pay when the debts matured. *Id.*, *§ 275*.

*Nirvana Rest. Inc. v. Paul's Laundromat, Inc. (In re Nirvana Rest. Inc.)*, 337 B.R. 495, 501 (Bankr. S.D.N.Y. 2006). [**32] As noted above, the Court has found that the Pre-Negotiation Agreement did not lack consideration. *See supra* Part III.B.1. Accordingly, we affirm the Bankruptcy Court's dismissal of Appellants' claim of fraudulent conveyance.

## 5. Equitable Subordination

Alternatively, Appellants request that Appellee's claim be subordinated to all other claims in the bankruptcy on equitable grounds. (Appellants' Br. at 23-24.) The doctrine of equitable subordination is codified in *Section 510(c) of the Bankruptcy Code*. *11 U.S.C. § 510(c)*. It authorizes the Bankruptcy Court to subordinate a claim where: (1) "[t]he claimant engaged in some type of inequitable conduct"; (2) "[t]he misconduct caused injury to the creditors or conferred an unfair advantage on the claimant"; and (3) "[e]quitable subordination of the claim is consistent with bankruptcy law." *80 Nas-*

---

[6]   Appellants argue that the Court should not permit the Pre-Negotiation Agreement to "create a valid lien in the place of a lien that otherwise would have been declared [**30] invalid." (*Id.*)

440 B.R. 224, *240; 2010 U.S. Dist. LEXIS 116366, **32

sau Assocs. v. Crossland Fed. Sav. Bank (In re 80 Nassau Assocs.), 169 B.R. 832, 837 (Bankr. S.D.N.Y. 1994) (quoting In re Mobile Steel Co., 563 F.2d 692, 700 (5th Cir. 1977)); see 9281 Shore Rd. Owners Corp. v. Seminole Realty Co. (In re 9281 Shore Rd. Owners Corp.), 187 B.R. 837, 852 (E.D.N.Y. 1995). "Inequitable conduct is generally defined as either [**33] (1) fraud, illegality, or breach of fiduciary duties; (2) undercapitalization; or (3) the claimant's use of the debtor as a mere instrumentality [*241] or alter ego." N.J. Steel Corp. v. Bank of N.Y., No. 95 Civ. 3071 (KMW), 1997 U.S. Dist. LEXIS 18137, 1997 WL 716911, at *4 (S.D.N.Y. Nov. 17, 1997) (citation omitted). "[A]nalysis of these factors differs, however, depending on the status of the creditor, specifically, whether the creditor acted as a[n] insider or an ordinary creditor." [7] Id. Because an ordinary creditor, like Appellee, does not owe a fiduciary duty to the debtor, it is rare for a court to subordinate claims arising out of such arms-length dealings. See 80 Nassau Assocs., 169 B.R. at 838. In the case of non-insider creditors, "unless the claimant controls the debtor, and exercises that control to gain an unfair advantage, the proponent of equitable subordination must show wrongful conduct involving fraud, illegality or some other breach of a legally recognized duty." Id. at 839.

Aside from making bare allegations, Appellants fail to show how Appellee committed fraud. For example, in making their claim of equitable subordination, Appellants label Appellee's behavior as "outrageous, in bad faith, and wholly inequitable" but fail to ground this conclusion in fact or law. (Appellants' Br. at 24.) Appellants [**35] plainly do not meet the

pleading requirements as set forth in Twombly. 550 U.S. at 555 ("[A] plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do" (alterations in original) (citation omitted).).

Additionally, any reliance by Appellants on other arguments raised in their brief, including their claim of fraudulent conveyance, is misplaced given the rejection of those claims above. Accordingly, the Court affirms the Bankruptcy Court's dismissal of Appellants' equitable subordination claim as well, because Appellants cannot satisfy even the first element of equitable subordination.

6. Waiver of Preference Claim

Appellants state in the "Statement of the Issues Presented" section of their brief that "[t]he Court below erred when holding that execution and delivery of the Pre-Negotiation Agreement was not an unlawful preference by the Debtors." (Appellants' Br. at 2.) Other than this cursory mention of the claim, Appellants do not raise the issue again until their reply brief. There, Appellants devote a total of three sentences to this claim, in which [**36] they either cite to non-existent portions of their brief or mis-cite portions of their brief. (Appellants' Reply Br. at 8.) The one sentence proffered in support of this claim — that the "Prefered Negotiation Agreement was for the excessive benefit of CFA and of no benefit to the Debtors and other creditors" (id.) — is conclusory and contradicts several undisputed facts in the record, see supra Part III.B.

---

[7]  In addition to the Bankruptcy Code's definition of the term "insider," 11 U.S.C. § 101(31), "courts have uniformly held that the Bankruptcy Code's definition is merely illustrative and that the term 'insider' must be flexibly [**34] applied on a case-by-case basis." Pan Am Corp. v. Delta Air Lines, Inc., 175 B.R. 438, 499 (S.D.N.Y. 1994).

  In determining whether a creditor is an "insider" of the debtor under this flexible approach, courts have considered a wide variety of factors, including whether the creditor: (i) received information from the debtor that was not available to other creditors, shareholders and the general public; (ii) attempted to influence decisions made by the debtor; (iii) selected new management for the debtor; (iv) had special access to the debtor's premises and personnel; (v) was the debtor's sole source of financial support; and (vi) generally acted as a joint venturer or prospective partner with the debtor rather than an arms-length creditor.

Id. at 500 (internal quotation marks and citations omitted). Appellee does not fall within any of these definitions of "insider."

[*242] Accordingly, the Court concludes that Appellants waived their claim of unlawful preference. (Appellants' Br. at 2.) "Issues not sufficiently argued in the briefs are considered waived and normally will not be addressed on appeal." *Norton v. Sam's Club*, 145 F.3d 114, 117 (2d Cir. 1998). Here, Appellants failed to meet even the modest requirements of *Rule 8010 of the Federal Rules of Bankruptcy Procedure*. See *Fed. R. Bankr. P. 8010(a)(1)(E)* ("The argument shall contain the contentions of the appellant with respect to the issues presented, and the reasons therefor, with citations to the authorities, statutes and parts of the record relied on."). Appellants' mere passing mention of the issue is completely devoid of analysis, and is thus deemed a waiver of it. See *Gazes v. Stephenson (In re Stephenson)*, Nos. 96 Civ. B. 557, 96 Civ. 558 (DC), 1996 U.S. Dist. LEXIS 10003, 1996 WL 403087, at *1 (S.D.N.Y. July 18, 1996) [**37] ("Appellant has utterly failed to comply with *Bankruptcy Rule 8010* . . . . Such a failure is grounds for dismissing a bankruptcy appeal.").

Moreover, even if the preference claim were properly raised before the Court, it would still fail because Appellants did not plead all of the necessary elements in their complaint. Specifically, as the Bankruptcy Court correctly concluded, Appellants failed to meet at least two elements required by *11 U.S.C. § 547(b)*. (J.A. at 352-53.) First, the Pre-Negotiation Agreement is not alleged to have been made on account of an antecedent debt. See *11 U.S.C. § 547(b)(2)*. Appellants have already conceded that they executed the Agreement as a precondition to discussing settlement options, and therefore, not on account of an antecedent debt. (J.A. at 68 ¶¶ 58, 58A.) Second, Appellants failed to even address *§ 547(b)(5)*, which states, *inter alia*, that a "trustee may avoid any transfer of an interest of the debtor in property that enables such creditor to receive more than such creditor would receive if (A) the case were a case under chapter 7 of this title; [**38] [and] (B) the transfer had not been made." *11 U.S.C. § 547(b)(5)*. Importantly, this claim also suffers from the same deficiency found in Appellants' fraudulent transfer argument — namely, it relies on the false assump-tion that the Pre-Negotiation Agreement consti-tuted a transfer. As explained above, the Agreement was not a transfer but an enforce-able contract. Accordingly, for the aforemen-tioned reasons, the Court concurs with the Bankruptcy Court's dismissal of Appellants' preference claim.

7. Public Policy

Finally, the Court finds no reason to reverse the Bankruptcy Court's decision on grounds of public policy. (Appellants' Br. at 24-25.) Con-trary to Appellants' assertions, the Pre-Negotia-tion Agreement is not inconsistent with New York's public policy encouraging settlements, nor is it inadmissible as a settlement discussion pursuant to *Federal Rule of Evidence 408*. (See id.) Here, the parties drafted and executed the Pre-Negotiation Agreement in order to ef-fectuate, not deter, settlement discussions. (J.A. at 68.) While *Rule 408* bars the admission of most evidence of settlements, it does not bar all such evidence. "Evidence of an offer to com-promise . . . can fall outside the Rule [**39] if it is offered for 'another purpose,' *i.e.*, for a purpose other than to prove or disprove the va-lidity of the claims that the offers were meant to settle." *Trebor Sportswear Co., Inc. v. The Ltd. Stores, Inc.*, 865 F.2d 506, 510 (2d Cir. 1989) (citing *Fed. R. Evid. 408*). Here, the Agree-ment is evidence of Appellants' intent to ratify the underlying CFA note and mortgage rather than proof of the contents of any offer to settle. The Agreement does not reveal the con-tents of any settlement discussions or offers that took place between the parties, and clearly [*243] states that while "[a]ll negotiations and discussions concerning the Loan . . . shall constitute settlement discussions . . . and may not be used or admitted into evidence in any court proceeding," the *"letter agreement* and the acknowledgements by Borrower contained [t]herein *may be admitted into evidence* in any such proceeding." (J.A. at 76 ¶ 3 (emphasis added).) Thus, the Agreement cannot itself be characterized as a settlement discussion.

Notably, Appellants do not cite to a single case from this jurisdiction where a court has found

440 B.R. 224, *243; 2010 U.S. Dist. LEXIS 116366, **39

a pre-negotiation agreement to be invalid on grounds of public policy. To the contrary, courts [**40] have consistently *upheld* comparable pre-negotiation agreements on the basis of New York's policy favoring the enforcement of un-ambiguous contracts. For example, in *Federal Home Loan Mortgage Corp.*, Judge Patterson enforced the terms set forth in a "pre-negotia-tion letter agreement" similar to the one at is-sue here. *1996 U.S. Dist. LEXIS 345, 1996 WL 15680, at *1-3* (upholding agreement whereby lender reserved the right to cease negotia-tions at any time and to execute all legal and eq-uitable rights, including foreclosure, given the "clear language" of the agreement). Likewise, New York state courts have found agreements similar to the one presently being challenged to be enforceable and valid contracts. *See 23rd St. Dev., LLC, 25 Misc. 3d 1214[A], 901 N.Y.S.2d 911, 2009 NY Slip Op 52093[U], 2009 WL 3337595, at *1-3* (enforcing a prenegotia-tion agreement that allowed the creditor to ter-minate negotiations for "any reason or no rea-son" and that resulted in debtor's waiver of any "defense, setoff, claim, counterclaim or cause of any kind or nature whatsoever with respect to the Loan Documents"); *U.S. Bank Nat'l Ass'n*

*v. 653 Eleventh Ave. LLC*, 23 Misc. 3d 1130[A], 889 N.Y.S.2d 508, 2009 NY Slip Op 51006[U], 2009 WL 1449082, at *1-3 (N.Y. Sup. Ct. 2009) (finding provisions in post-maturity agreements to be enforceable, [**41] including waiver of defenses and reser-vation of lender's right to foreclose). Accord-ingly, the Court concludes that the Pre-Negotia-tion Agreement at issue in this case does not run counter to public policy.

IV. CONCLUSION

For the foregoing reasons, the Court affirms the Bankruptcy Court's August 2009 Order. The Clerk of the Court is respectfully directed to close this case.

SO ORDERED.

/s/ Richard J. Sullivan

RICHARD J. SULLIVAN

United States District Judge.

Dated: November 1, 2010

New York, New York